**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE RICHARD K. EATON, JUDGE**

| | |
|---|---|
| **GO-PAK PAPER PRODUCTS VIETNAM CO., LTD.,** | |
| **Plaintiff,** | |
| **v.** | **Court No. 25-00070** |
| **UNITED STATES,** | **PUBLIC VERSION** |
| **Defendant,** | |
| **and** | **BPI Removed from Brackets on Pages 10, 25 and 27** |
| **AMERICAN PAPER PLATE COALITION,** | |
| **Defendant-Intervenor.** | |

**DEFENDANT-INTERVENOR'S OPPOSITION TO THE RULE 56.2 MOTION**

Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel: (202) 991-2701

Date: January 20, 2026

*Counsel to Defendant-Intervenor
American Paper Plate Coalition*

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

RULE 56.2 STATEMENT .............................................................................................. 1

1.    The Administrative Determination Under Review ............................................. 1

2.    The Issues Presented and Reasons Supporting Commerce's Determination...................... 2

   A.    Whether Commerce's determination to calculate surrogate financial ratios using the financial statements of both PT Suparma Tbk. ("Suparma") and PT Alkindo Naratama Tbk ("Alkindo") was supported by substantial evidence on the record and otherwise in accordance with law................................................................................................ 2

   B.    Whether Commerce's determination to use a simple average of average unit values ("AUVs") from two different Harmonized Tariff Schedule ("HTS") subheadings (HTS subheadings 4810.32.90 and 4810.92.90) as the surrogate value for the paperboard input used in the production of paper plates was supported by substantial evidence on the record and otherwise in accordance with law. ..................................................................... 2

JURISDICTION ........................................................................................................... 3

STANDARD OF REVIEW ............................................................................................. 3

STATEMENT OF FACTS .............................................................................................. 4

SUMMARY OF THE ARGUMENT .............................................................................. 14

ARGUMENT ............................................................................................................. 15

   I.    COMMERCE'S SELECTIONS OF SURROGATE VALUES FOR THE FINANCIAL RATIOS AND THE PAPERBOARD INPUT WERE SUPPORTED BY SUBSTANTIAL EVIDENCE AND WERE OTHERWISE IN ACCORDANCE WITH LAW ................................................................................................ 15

      A.    Legal Framework ..................................................................................... 15

      B.    Commerce's Determination to Average the Financial Ratios Derived from Alkindo's and Suparma's Financial Statements Was in Accordance with Law........... 19

      C.    Commerce's Determination to Value the Paperboard Input into Paper Plates Using Both HTS Subheadings 4810.32.90 and HTS Subheading 4810.92.90 Was in Accordance with Law ................................................................................. 24

CONCLUSION .......................................................................................................... 29

PUBLIC VERSION

## TABLE OF AUTHORITIES

### CASES

*Ad Hoc Coalition of American SAP Producers v. United States*,
　　Slip Op. 24-26, Court No. 23-00010 (Fed. Cir. Mar.1, 2024) ................................................. 18

*Ad Hoc Shrimp Trade Action Committee v. United States*,
　　618 F.3d 1,316 (Fed. Cir. 2010).................................................................................. 16, 19, 22

*Ashley Furniture Industries, LLC v. United States*,
　　750 F. Supp. 3d 1,329 (Ct. Int'l Trade 2024) ................................................................... 17, 22

*Atl. Sugar Ltd. v. United States*,
　　744 F.2d 1,556 (Fed. Cir. 1984)............................................................................................... 4

*Changzhou Trina Solar Energy v. United States*,
　　975 F.3d 1,318 (Fed. Cir. 2020)................................................................................... 17, 23, 28

*Cleo In. v. United States*,
　　501 F.3d 1,291 (Fed. Cir. 2007)............................................................................................... 3

*Consolidated Edison v. NLRB*,
　　305 U.S. 197 (1938)................................................................................................................. 3

*Consolo v. Fed. Mar. Comm'n*,
　　383 U.S. 607 (1966)................................................................................................................. 4

*Dorbest Ltd. v. United States*,
　　604 F.3d 1,363 (Fed. Cir. 2010)............................................................................................. 19

*Fujitsu Gen'l Ltd. v. United States*,
　　88 F.3d 1,034 (Fed. Cir. 1996)................................................................................................. 3

*Goldlink Indus. Co. v. United States*,
　　431 F. Supp. 2d 1,323 (Ct. Int'l Trade 2006) ......................................................................... 4

*Matsushita Elec. Indus. Co. v. United States*,
　　750 F.2d 927 (Fed. Cir. 1984)................................................................................................. 3

*National Ford Chem. Co. v. United States*,
　　166 F. 3d 1,373 (Fed. Cir. 1999)................................................................................. 16, 21, 23, 28

*Nippon Steel Corp. v. United States*,
　　458 F.3d 1,345 (Fed. Cir. 2006)............................................................................................... 4

*NTSF Seafoods Joint Stock Company v. United States*,
　　487 F. Supp. 3d 1,310 (Ct. Int'l Trade 2020) ....................................................................... 19

*PAM, S.p.A v. United States*,
    582 F.3d 1,336 (Fed. Cir. 2009)................................................................ 3

*Pesquera Mares Australes Ltda. v. U.S.*,
    266 F.3d 1,372 (Fed. Cir. 2001)............................................................. 18

*Risen Energy Co., Ltd. v. United States*,
    122 F. 4th 1,348 (Fed. Cir. 2024) ............................................. 16, 17, 28

*Timken Co. v. United States*,
    699 F. Supp. 300 (Ct. Int'l Trade 1988) ................................................ 4

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009)................................................................................ 3

### STATUTES

19 U.S.C. §§ 1516a(a)(2)(A) and (a)(2)(B)(i) ............................................... 3

19 U.S.C. § 1677(18)(A)............................................................................... 15

19 U.S.C. § 1677b(c) ............................................................................. 15, 16

19 U.S.C. §§ 1677b(c)(1), (3), & (4) ....................................................... 6, 16

28 U.S.C. § 1581(c) ....................................................................................... 3

### ADMINISTRATIVE DETERMINATIONS & PUBLICATIONS

*Certain Paper Plates from the People's Republic of China, Thailand, and the Socialist Republic of Vietnam*,
    90 Fed. Reg. 8,265 (Dep't of Commerce Jan. 28, 2025) (final determ.), and
    accompanying Issues and Decision Memorandum (Jan. 21, 2025).................................. *passim*

*Certain Paper Plates from the Socialist Republic of Vietnam*,
    89 Fed. Reg. 72,375 (Dep't of Commerce Sept. 5, 2024) (prelim. determ.), and
    accompanying Preliminary Decision Memorandum. .................................................... 8, 9, 20

*Certain Paper Plates from Vietnam*,
    89 Fed. Reg. 14,406 (Dep't of Commerce Feb. 26, 2024) (initiation) ....................................... 4

## RULE 56.2 STATEMENT

Defendant-Intervenor American Paper Plate Coalition ("APPC" or "Petitioner"),[1]

petitioner in the underlying investigation, respectfully submits this response to the Rule 56.2

motion for judgment on the agency record filed in this case by plaintiff Go-Pak Paper Products

Vietnam Co., Ltd. ("Go-Pak"), ECF Nos. 27 and 28 ("Go-Pak Br.").

### 1.  The Administrative Determination Under Review

The administrative determination under review is the final determination of the less-than-

fair value ("LTFV") investigation of certain paper plates from the Socialist Republic of Vietnam

issued by the U.S. Department of Commerce ("Commerce"), covering the period of investigation

("POI") of July 1, 2023, through December 31, 2023.  *Certain Paper Plates from the People's

Republic of China, Thailand, and the Socialist Republic of Vietnam*, 90 Fed. Reg. 8,265 (Dep't

of Commerce Jan. 28, 2025) (final determ.), P.R. 236 ("*Final Determination*"), and

accompanying Issues and Decision Memorandum (Jan. 21, 2025), P.R. 227 ("IDM").[2]

---

[1] The APPC is composed of American paper plate manufacturers AJM Packaging Corporation, Aspen Products, Inc., Dart Container Corporation, Hoffmaster Group, Inc., Huhtamaki Americas, Inc., and Unique Industries, Inc.

[2] Public documents in the administrative record are designated as "P.R." and confidential documents are designated as "C.R."  Business proprietary information from confidential documents is designated using square brackets and is redacted from the public version of this brief, in accordance with Rule 5(g) of the Court's Rules.

2. **The Issues Presented and Reasons Supporting Commerce's Determination**

A. **Whether Commerce's determination to calculate surrogate financial ratios using the financial statements of both PT Suparma Tbk. ("Suparma") and PT Alkindo Naratama Tbk ("Alkindo") was supported by substantial evidence on the record and otherwise in accordance with law.**

**Yes.** Commerce determined that both Suparma and Alkindo were Indonesian producers of merchandise comparable to the subject merchandise and were profitable during the relevant fiscal year, that both companies' financial statements were contemporaneous with the POI, and that both companies' financial statements were not otherwise distorted or unreliable. Accordingly, Commerce's use of both companies' financial statements to calculate financial ratios was supported by substantial evidence and otherwise in accordance with law.

B. **Whether Commerce's determination to use a simple average of average unit values ("AUVs") from two different Harmonized Tariff Schedule ("HTS") subheadings (HTS subheadings 4810.32.90 and 4810.92.90) as the surrogate value for the paperboard input used in the production of paper plates was supported by substantial evidence on the record and otherwise in accordance with law.**

**Yes.** Commerce's use of an average of the AUVs for HTS[3] subheading 4810.92.90, which includes paperboard too lightweight to be used to produce paper plates, and HTS subheading 4810.32.90, which covers paperboard specific to the basis weights used to produce paper plates, *i.e.*, greater than 150 grams per square meter ("GSM" or g/m$^2$), was reasonable. Commerce's method considered both the basis weight and type of the paperboard, consistent with the importance of these characteristics in the product characteristic hierarchy developed by Commerce early in the investigation for use in the antidumping calculations. Commerce's

---

[3] "HTS" refers to the Harmonized Tariff Schedule of the United States, which is published and maintained by the United States International Trade Commission, in accordance with 19 U.S.C. § 3005.

determination to use both HTS subheadings to calculate the paperboard surrogate value was supported by substantial evidence and otherwise in accordance with law.

## JURISDICTION

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), as this action was commenced under 19 U.S.C. §§ 1516a(a)(2)(A) and (a)(2)(B)(i).

## STANDARD OF REVIEW

In reviewing Commerce's antidumping ("AD") determinations, the Court of International Trade ("CIT") must sustain "any determination, finding or conclusion found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen'l Ltd. v. United States*, 88 F.3d 1,034, 1,038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938); *accord Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984); *PAM, S.p.A v. United States*, 582 F.3d 1,336, 1,339 (Fed. Cir. 2009). The specific factual findings on which Commerce relies "in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).

Under the substantial evidence standard, a Court may not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo In. v. United States*, 501 F.3d 1,291, 1,296 (Fed. Cir. 2007). As the Supreme Court has held, substantial evidence is "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent" an

agency determination from being "supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Accordingly, the CIT has explained that it will not substitute its judgment for that of Commerce in choosing between two fairly conflicting interpretations of the facts on the record. *See Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988); *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1,323, 1,326 (Ct. Int'l Trade 2006). Further, the Court of Appeals for the Federal Circuit ("Federal Circuit") has held that "substantial evidence on the record means 'more than a mere scintilla' and such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," even if some evidence on the record detracts from the agency's ultimate determination. *Atl. Sugar Ltd. v. United States*, 744 F.2d 1,556, 1,562-63 (Fed. Cir. 1984) (citing *Universal Camera Corp. v. N.L.R.B*, 340 U.S. 474, 477 (1951)); *PAM S.p.A. v. United States*, 582 F.3d 1,336, 1,339 (Fed. Cir. 2009)). As the Federal Circuit has held, the substantial evidence standard is a "high barrier" for a challenging party to overcome. *Nippon Steel Corp. v. United States*, 458 F.3d 1,345, 1,352 (Fed. Cir. 2006) (citing *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1,056, 1,060 (Fed. Cir. 2001)).

## STATEMENT OF FACTS

Following the filing of a petition by APPC alleging that imports of certain paper plates from China, Vietnam, and Thailand were being, or likely to be, sold in the United States for less-than-fair value and/or unfairly subsidized, Commerce initiated, *inter alia*, an antidumping duty ("AD") investigation of imports from the Socialist Republic of Vietnam ("Vietnam") on February 14, 2024. Formal notice was published in the Federal Register on February 26, 2024. *Certain Paper Plates from Vietnam*, 89 Fed. Reg. 14,406 (Dep't of Commerce Feb. 26, 2024) (initiation), P.R. Doc. 41.

Very early in the investigation, Commerce requested comments from interested parties on the physical characteristics of paper plates that should be used to define individual types of paper plate products in Commerce's AD calculations. This exercise is necessary to create unique numerical codes ("control numbers" or "CONNUMS") for each discrete product type, which are then used in the antidumping calculations.

After receiving comments from both APPC and Go-Pak, on April 23, 2024, Commerce issued a memorandum detailing the characteristics it had selected, ranked by their order of importance. Memorandum from Bryan Hansen, Senior International Trade Compliance Analyst, AD/CVD Operations, Office I, to the File, *AD Investigations of Certain Paper Plates from the People's Republic of China, Thailand, and the Socialist Republic of Vietnam: Product Characteristics* (Apr. 23, 2024), P.R. 88 ("*Product Characteristics Memorandum*").

Commerce identified and listed 17 product characteristics[4] and ranked them in order of importance. The first six are identified as: 1) the number of paper plates in each wrapped package; 2) the surface area of the paper plates; 3) the thickness of the paperboard used to produce the plate (*i.e.*, the caliper); 4) the "basis weight", expressed in GSM, of the paperboard from which the paper plate is made; 5) the type of paper fiber used to produce the plate; and 6) the type of paper used to produce the plate. *Id.*, Attachment, at 1-2.

"Basis weight" was described as the measurement of the "density" of the "paper/paperboard input of which the paper plate is made." *Id.* at 2. As noted above, the basis weight of paper is commonly described in terms of the number of grams a square meter of the paper weighs. The heavier the paper, the greater the basis weight. Paper plates require

---

[4] Commerce used the first 13 of these product characteristics to determine the control number ("CONNUM") that identifies each unique product produced and sold by the respondent parties.

paperboard of sufficient rigidity, and hence basis weight, to be fit for purpose and not collapse when used.

Commerce selected Go-Pak Paper Products Vietnam ("Go-Pak") and Xie Li Viet Nam International Company Limited ("Xie Li") as respondents for individual examination ("mandatory respondents") and issued them questionnaires. Xie Li then withdrew from the investigation, leaving Go-Pak as the sole mandatory respondent.

Because Vietnam is a non-market economy ("NME") country, Commerce does not use prices of sales of paper plates in Vietnam in its AD calculations. Instead, Commerce gathers detailed information and data identifying each input consumed by a foreign producer to manufacture the merchandise being investigated. Thus, Go-Pak was required to report its factors of production ("FOPs") (*i.e.*, the amounts of each input consumed to produce its paper plates), in accordance with Commerce's NME country analysis, rather than prices in Vietnam for sales of paper plates. 19 U.S.C. §§ 1677b(c)(1) & (3). On June 12, 2024, Go-Pak reported "each raw material used to produce a unit of the merchandise under consideration" in its Section D Questionnaire Response. Letter from Trade Pacific to Sec'y of Commerce, *Go-Pak Section D Questionnaire Response* (June 12, 2024), P.R. 116; C.R. 46. Of the reported inputs, the primary input consumed in the production of paper plates was paperboard. *See id.* at D-10–D-11.

In an AD investigation involving an NME country, Commerce values a producer's FOPs using surrogate values obtained from a third country that is at a comparable level of economic development and a substantial producer of comparable merchandise. In valuing FOPs, Commerce provides an opportunity for the parties to submit information and argument concerning the most suitable surrogate country, and the most suitable surrogate values to be used to value the individual factors of production.

On June 20, 2024, APPC submitted its proposed surrogate values for this investigation. Letter from The Bristol Group to Sec'y of Commerce, *APPC's Surrogate Value Submission* (June 20, 2024), P.R. 119-124 ("*APPC's SV Sub*.").  APPC proposed using data from HTS subheading 4810.32.90 as a surrogate value for the paperboard input, which was described as "Kraft Paper and Paperboard, Bleached Oth in Rolls <150 Mm Width/Sheets No Side>360 Mm Unfolded State Weighing > 150G/M2."  *Id.* at Exhibit 1, P.R. 119.

For Commerce's financial ratio calculations, APPC proposed using the 2023 annual report of an Indonesian producer of comparable merchandise, Suparma, that was "used both in the initiation phase of this investigation, as well as in the recent investigation involving File Folders from Vietnam."  *Id.* at 3 & Exhibit 5 (referencing *Paper File Folders from the Socialist Republic of Vietnam*, 88 Fed. Reg. 31,488 (Dep't of Commerce May 17, 2023) (prelim. determ.) (unchanged in final determination), P.R. 119-123.

The same day, Go-Pak filed its proposed surrogate values, proposing use of HTS subheading 4810.92.90 to value its paperboard.  HTS 4810.92.90 covers "Paper and paperboard, multi-ply, in rolls of >150mm in width or sheets of which side >360 mm in the unfolded state."

Go Pak also proposed using the 2023 audited financial statement of an Indonesian producer of paper bowls, paper cups, paper food boxes, and other paper products in Indonesia, Alkindo, for Commerce's final ratio calculations.  Letter from Trade Pacific to Sec'y of Commerce, *Go-Pak Comments on Surrogate Values* (June 20, 2024), at 2 & Exhibits SV-1, SV-9–SV-12, P.R. 125-127.

On July 2, 2024, APPC filed rebuttal surrogate value information.  Letter from The Bristol Group to Sec'y of Commerce, *APPC Rebuttal Comments on Surrogate Values* (July 2, 2024), P.R. 145.

On July 3, 2024, Go-Pak submitted its own rebuttal surrogate value submission. Letter from Trade Pacific to Sec'y of Commerce, *Go-Pak Rebuttal Comments on Surrogate Values* (July 3, 2024), P.R. 143-154 ("*Go-Pak SV Rebuttal*").

Commerce subsequently instructed Go-Pak to provide greater detail on the paperboard inputs that it purchased for use in the production of subject merchandise. On July 29, 2024, Go-Pak provided its response. Letter from Trade Pacific to Sec'y of Commerce, *Go-Pak Third Supplemental Questionnaire Response* (July 29, 2024), at SD3-4 & SD3-5, P.R. 169; C.R. 95-99. Go-Pak provided additional description of the paperboard it uses to produce paper plates, including its basis weight. *Id.* at SD3-5, P.R. 169; C.R. 95.

On July 25, 2024, APPC filed comments and analysis for Commerce's consideration in advance of the preliminary determination, advocating for the use of the Suparma's financial statements to determine surrogate financial ratios, and HTS subheading 4810.32.90 to value the paperboard input. Letter from The Bristol Group to Sec'y of Commerce, *APPC Pre-Prelim Comments* (July 25, 2024) at 4-7, P.R. 167; C.R. 93-94.

On August 2, 2024, Go-Pak submitted its own comments prior to Commerce's preliminary determination. Letter from The Bristol Group to Sec'y of Commerce, *Go-Pak Vietnam's Comment Regarding Preliminary Determination* (Aug. 2, 2024), P.R. 170; C.R. 100. Go-Pak advocated for using Akindo's financial statements to determine surrogate financial ratios, and HTS subheading 4810.92.90 to value the paperboard input. *Id.* at 1-9.

Commerce issued the preliminary determination in the underlying investigation on September 5, 2024. *Certain Paper Plates from the Socialist Republic of Vietnam*, 89 Fed. Reg. 72,375 (Dep't of Commerce Sept. 5, 2024) (prelim. determ.), P.R. 198, and accompanying preliminary decision memorandum, P.R. 187 ("PDM"). *See also* Memorandum from Bryan

Hansen, Senior International Trade Compliance Analyst, AD/CVD Operations, Office 1, through Yang Jin Chun, Program Manager, AD/CVD Operations, Office I, to File, *Investigation of Sales at Less Than Fair Value of Certain Paper Plates from the Socialist Republic of Vietnam: Preliminary Surrogate Value Memorandum* (Aug. 29, 2024) ("*PSV Memo*"), P.R. 188. Commerce explained that because it selected Indonesia as the surrogate country, it used publicly available surrogate value data from Indonesian sources. *PSV Memo* at 2. With respect to paperboard, Commerce preliminarily determined to use the AUV of Go-Pak's proposed surrogate value HTS subheading 4810.92.90 because it represented multilayered ("multi-ply") paper larger than 150 mm in width – a characteristic of Go-Pak's input paperboard. *Id.* at 3 & 4. Commerce preliminarily declined to use APPC's proposed surrogate value because it covered kraft paper with "more than 95% by weight of the total fiber content consist{ing} of wood fibers obtained by a chemical process," while Go-Pak did not use kraft paper and its paper was "composed of only 25-33% Chemical Pulp." *Id*. at 4.

With respect to surrogate financial ratios, Commerce preliminarily determined to use an average of the 2023 financial statements of both Alkindo and Suparma. *Id.* at 7. It explained that because both Indonesian companies "are producers of merchandise comparable to the subject merchandise," and the financial statements reflected a period contemporaneous with the POI," that Commerce determined that information derived from those financial statements was "the best available information on the record to calculate surrogate financial ratios." PDM at 23-24.

From September 9 to September 12, 2024, Commerce verified Go-Pak's FOP questionnaire response. Memorandum from Bryan Hansen and Christopher Williams, International Trade Compliance Analysts, AD/CVD Operations, Office 1, through Yang Jin

Chun, Program Manager, AD/CVD Operations, Office I, to File, *Antidumping Duty Investigation of Certain Paper Plates from the Socialist Republic of Vietnam: Factors of Production Verification Report* (Oct. 15, 2024), P.R. 209; C.R. 177 ("*FOP Verification Report*"). With respect to Go-Pak, [    ] percent of its U.S. sales were identified as having a basis weight of [                    ], and at verification Commerce confirmed that the basis weights of Go-Pak's Vietnam paperboard inputs were [                    ]. *See id.* at 7; Letter from Trade Pacific to Sec'y of Commerce, *Paper Plates from the Socialist Republic of Vietnam: Go-Pak Vietnam's Revised FOP and U.S. Sales Databases* (Oct. 28, 2024) at Exhibit 2, P.R. 210; C.R. 179 ("*Go-Pak's Revised FOP and U.S. Sales Databases*").

On November 14, 2024, Go-Pak and APPC filed their case briefs with Commerce. Letter from Trade Pacific to Sec'y of Commerce, *Go-Pak Vietnam Case Brief* (Nov. 14, 2024), P.R. 218; C.R. 183 ("Go-Pak Case Br."); Letter from The Bristol Group to Sec'y of Commerce, *APPC Case Brief* (Nov. 14, 2024), P.R. 217; C.R. 182 ("APPC Case Br."). Go-Pak argued that Commerce should use only the Alkindo financial statements as the source of surrogate financial ratios because Alkindo, like Go-Pak, only produced products from paper, while Suparma also manufactured paper, tissue and tissue towels. Go-Pak Case Br. at 5-6.

APPC, on the other hand, argued that Commerce should only use Suparma's financial statements as the source of surrogate financial ratios for various reasons, including that unlike Suparma, Alkindo's financial statements commingled the financial results of three companies involved in industries unrelated to the subject merchandise: yarn and textiles for one; wood, paint, yarn and textiles for a second; and logistics services for a third. APPC Case Br. at 14-27.

With respect to paperboard, APPC provided two alternative arguments. First, APPC argued that Commerce should solely use HTS subheading 4810.32.90 because under the

CONNUM hierarchy established at the beginning of the investigation, basis weight was the fourth-most important characteristic of the paper input, while paper type was determined by Commerce to be the sixth-most important characteristic. APPC Case Br. at 4-11.

APPC explained that regardless of the type of paperboard used, a paper plate must be manufactured from "a sufficiently heavy basis weight" to be "sufficiently sturdy and rigid for its intended purpose, holding and conveying food items." *Id.* at 9. APPC pointed out that HTS subheading 4801.32.90 was specific to basis weights over 150g/m$^2$, while the HTS category used in the preliminary determination and advocated by Go-Pak was "not specific to any basis weights," "was specific only to paper type," and, in fact, encompassed "all basis weights." *Id.* at 8–10. Furthermore, APPC cited to proprietary information Commerce considered in verifying Go-Pak's production experience to "confirm" that the company used "high basis weights," best represented by HTS subheading 4810.32.90. *Id.* at 9.

In the alternative, APPC argued that a second viable alternative was for Commerce to "follow its prior practice and use a simple average of HTS 4810.92.90 and HTS 4801.32.90." APPC Case Br. at 13. APPC argued that although it believed HTS subheading 4810.32.90 was the most accurate source of the paperboard surrogate value for determining a surrogate value for paperboard input on the record (based on basis weight specificity), it did not disagree that HTS subheading 4810.92.90 was more specific to Go-Pak's experience based solely on paper type. *Id.* Accordingly, APPC cited to several of Commerce's past determinations in which the agency applied a simple average of two or more HTS subheadings to determine a "the most representative" surrogate value. *Id.* at 11-13.

On November 20, 2024, Go-Pak filed its rebuttal brief. Go-Pak continued to advocate for using only HTS subheading 4810.92.90, arguing that it was the only classification that shared

characteristics with Go-Pak's paperboard and that introducing a simple average of the two HTS classifications in Commerce's surrogate value calculations would cause, rather than remove, distortions. Letter from Trade Pacific to Sec'y of Commerce, *Rebuttal Brief of Go-Pak Vietnam* (Nov. 20, 2024), at 6-11, P.R. 222, C.R. 183 ("Go-Pak Rebuttal Br."). In response to APPC's arguments about Alkindo's financial statements, Go-Pak argued that Alkindo's paper production experience was closer to Go-Pak's experience than Suparma's paper production experience. *Id.* at 11-17.

APPC also filed a rebuttal brief that same day. APPC defended the use of the Suparma financial statements, arguing that Suparma produces comparable merchandise, and challenging Go-Pak's claims that Alkindo's financial statements more closely reflected the overall production experience of Go-Pak than Suparma's financial statements. Letter from The Bristol Group to Sec'y of Commerce, *Rebuttal Brief of APPC* (Nov. 20, 2004), at 2-5, P.R. 221 ("APPC Rebuttal Br."). Citing to information on the record, APPC argued that Go-Pak's claim that the two possible surrogate Indonesian companies were in "different industries" was "baseless." *Id.* at 6-8.

On January 28, 2025, Commerce issued the *Final Determination*. For purposes of calculating surrogate financial ratios, Commerce continued to use a simple average of the financial ratios derived from both Alkindo's and Suparma's financial statements. IDM at 13-16. Commerce determined that Suparma is a producer of "laminated paper for holding, place and wrapping food as does a paper bowl or paper plate." *Id.* at 16. Accordingly, it determined that Suparma was a producer of "comparable merchandise." *Id.* Furthermore, it determined that the "production experiences between Go-Pak Vietnam and Suparma are not so different to disqualify

12

Suparma's financial statements from being used to calculate surrogate financial ratios in this investigation." *Id.*

With respect to Alkindo, Commerce found that even if 25 percent of its revenue came from non-paper industries, it "earned 75 percent of its revenue from paper industries, which supports, rather than precludes, the use of Alkindo's financial statements." *Id.* at 15-16. Thus, Commerce determined that both companies' financial statements satisfied its preference of using financial statements that "(1) cover a period contemporaneous with the POI; (2) show profit; (3) are from companies with a production experience similar to that of the mandatory respondent; and (4) are not distorted or otherwise unreliable." *Id.* at 13.

For the surrogate value for the paperboard input, Commerce modified its analysis from the preliminary determination and determined to use a simple average of the AUVs from HTS subheading 4810.32.90 and HTS subheading 4810.92.90. IDM at 9. With respect to the HTS subheading advocated by Go-Pak, Commerce agreed with Go-Pak that the plain reading of the HTS description for 4810.92.90 covered "paper and paperboard" and "multi-ply" which were "consistent with Go-Pak Vietnam's paper input." *Id.* Furthermore, Commerce pointed out that Go-Pak used that HTS subheading "on import documentation for Go-Pak Vietnam's purchases of its paper input." *Id.*

However, Commerce also agreed with APPC that, contrary to its preliminary finding, HTS subheading 4810.92.90 did not address "basis weight," which Commerce explained "is a critical component in the manufacture and sale of paper plates" as reflected in Commerce's product characteristics hierarchy. *Id.* at 10. It further agreed with APPC that HTS subheading 4810.32.90 represented "a product that weighs more than 150 grams/meter$^2$, which is a critical consideration in this investigation." *Id.*

Therefore, because Commerce determined it was "necessary to take paper basis (sic) weight into consideration in the valuation" of Go-Pak's paper inputs, Commerce concluded that "a simple average of the AUVs constitutes the best available information to value" Go-Pak's paper inputs on the record. *Id.* at 9-10.

This appeal followed.

SUMMARY OF THE ARGUMENT

Substantial evidence supported Commerce's decision to use the simple average of the Suparma and Alkindo financial statements to determine surrogate financial ratios. Commerce correctly determined that Suparma and Alkindo were both Indonesian producers of merchandise comparable to the subject merchandise and were profitable during the POI, that the financial statements were contemporaneous with the POI, and that the financial statements were not otherwise distorted or unreliable. Accordingly, consistent with the substantial evidence on the record, Commerce reasonably followed its practice in calculating the surrogate financial ratios using the two sets of financial statements. That determination was fully in accordance with law.

Furthermore, Commerce's decision to use an average of the AUVs for HTS subheading 4810.92.90, which covers a broad category of paper and paperboard not specific to any basis weight, and HTS subheading 4810.32.90, which applies to kraft paper and paperboard with a basis weight exceeding 150 g/m², to determine a surrogate value for the paperboard input was also supported by substantial evidence and in accordance with law. Commerce's use of the two HTS subheadings in its surrogate value calculations allowed it to consider both the basis weight and the type of paperboard used by Go-Pak in producing paper plates, consistent with Commerce's product comparison hierarchy. Accordingly, Commerce's use of both HTS subheadings to determine a surrogate value for the paperboard input was reasonable and

14

consistent with the agency's goal of selecting a surrogate value that was most representative of the paperboard used to produce subject merchandise on the record.

## ARGUMENT

I. **COMMERCE'S SELECTIONS OF SURROGATE VALUES FOR THE FINANCIAL RATIOS AND THE PAPERBOARD INPUT WERE SUPPORTED BY SUBSTANTIAL EVIDENCE AND WERE OTHERWISE IN ACCORDANCE WITH LAW**

In the *Final Determination*, Commerce selected a surrogate value for financial ratios using an average amount derived from the financial statements of two Indonesian paper product producers, and a surrogate value for paperboard inputs derived from two HTS subheading classifications. Go-Pak challenges those determinations, arguing that Commerce should have used only its preferred source of surrogate ratios and a single HTS subheading to value paperboard, each of which it advocated before the agency. However, substantial evidence on the record supported Commerce's determination to use both the surrogate values argued by Go-Pak, as well as the additional surrogate values which Commerce included in its calculations, for the reasons explained by Commerce in the *Final Determination*. Accordingly, the Court should affirm both of Commerce's surrogate value determinations as supported by substantial evidence on the record and otherwise in accordance with law.

A. **Legal Framework**

Commerce considers Vietnam to be a nonmarket economy country, pursuant to 19 U.S.C. § 1677(18)(A), *i.e.*, a country with an economy that does "not operate on market principles of cost or pricing structures, so that sales of merchandise in such country to not reflect the fair value of the merchandise." Thus, in accordance with 19 U.S.C. § 1677b(c), Commerce does not use prices of sales of paper plates in Vietnam to establish "normal value" (the price in the home market that is compared to U.S. prices), and instead calculates a proxy normal value for the AD

calculation using the FOPs (amounts of each input consumed to produce the subject merchandise) reported by the examined respondents, which are then valued using surrogate values from "significant producers of comparable merchandise," obtained from a market economy country "at a level of economic development comparable to that of the nonmarket economy." 19 U.S.C. §§ 1677b(c)(1) & (4). In addition, Commerce is directed by the statute to add "an amount for general expenses and profit plus the cost of containers, coverings and other expenses." 19 U.S.C. § 1677b(c)(1). Surrogate values are to "be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate" by Commerce. *Id.*

At issue in this litigation are the sources of two surrogate values – the surrogate financial statements used to value Go-Pak's selling, general, and administrative expenses, factory overhead, and profit (*i.e.*, the surrogate financial ratios), and the HTS subheadings used to value Go-Pak's paperboard input.

With respect to the surrogate financial ratios, Commerce calculates such ratios using data from financial statements of producers of identical or comparable merchandise in the surrogate country. Generally, if financial statements of more than one producer of comparable merchandise in a surrogate country are available, "Commerce averages the financial ratios derived from all the available financial statements." *Ad Hoc Shrimp Trade Action Committee v. United States*, 618 F.3d 1,316, 1,320 (Fed. Cir. 2010) ("*Ad Hoc Shrimp*").

The Federal Circuit has held that "the statute 'accords Commerce wide discretion in the valuation of factors of production.'" *Id.* (citing *National Ford Chem. Co. v. United States*, 166 F. 3d 1,373, 1,377 (Fed. Cir. 1999) ("*National Ford*")). This is "because the tariff statute does not define what constitutes the 'best available information.'" *Risen Energy Co., Ltd. v. United*

*States*, 122 F. 4th 1,348, 1,353 (Fed. Cir. 2024) ("*Risen*") (citing *Changzhou Trina Solar Energy*

*v. United States*, 975 F.3d 1,318, 1,321 (Fed. Cir. 2020) ("*Changzhou Trina*") (quoting *QVD*

*Food Co. v. United States*, 658 F.3d 1,318, 1,323 (Fed. Cir. 2011))).

 Further, although the Court of International Trade ("CIT") and Federal Circuit have

acknowledged that a "surrogate value must be as representative of the situation in the (nonmarket

economy) country as is feasible," they have held that "Commerce need not 'duplicate the exact

production experience of the (foreign) manufacturers at the expense of choosing a surrogate

value' for that value to constitute the 'best available information.'" *Ashley Furniture Industries,*

*LLC v. United States*, 750 F. Supp. 3d 1,329, 1,350 (Ct. Int'l Trade 2024) (citing *National Ford*,

166 F.3d at 1,377 (quoting *National Ford Chem. Co. v. United States*, 985 F. Supp. 133, 137 (Ct.

Int'l Trade 1997))).

 With respect to the inputs used in the production of subject merchandise, Commerce

normally will select, "to the extent practicable, surrogate values that are publicly available, are

product-specific, reflect a broad market average, and are contemporaneous" with the period of

investigation or review. *Changzhou Trina*, 975 F.3d at 1,331 (quoting *Qingdao Sea-Line*

*Trading Co. v. United States*, 766 F.3d 1,378, 1,386 (Fed. Cir. 2014)).

 In selecting an input surrogate value, "Commerce frequently uses import data from HTS

categories as the 'best available information' to calculate a specific surrogate price by weight (or

unit) for the input under the HTS category chosen." *Risen*, 122 F. 4th at 1,354. "In doing so,

Commerce seeks to select the HTS category that most precisely corresponds to the particular

input." *Id.*

 In the investigation at issue, a key factor in Commerce's selection of a surrogate value for

paperboard was its consideration of "basis weight" as an extremely important physical

characteristic when establishing a model match hierarchy for the subject merchandise. The Federal Circuit has held that a determination of the physical characteristics used in model matching hierarchies is a "fact-intensive inquiry," over which Commerce has a significant amount of discretion. *See Ad Hoc Coalition of American SAP Producers v. United States*, Slip Op. 24-26, Court No. 23-00010 (Fed. Cir. Mar.1, 2024) at *5; *Pesquera Mares Australes Ltda. v. U.S.*, 266 F.3d 1,372, 1,384 (Fed. Cir. 2001) (stating that Commerce "has considerable discretion in defining" the relevant physical characteristics in its model matching methodology).

Go-Pak challenges Commerce's decision to calculate its surrogate financial ratios using both Alkindo's and Suparma's financial statements. Go-Pak Br. at 5-16. However, Commerce's determination that both Alkindo and Suparma are producers of comparable merchandise and that both sets of financial statements were contemporaneous with the POI – and therefore that surrogate financial ratios should be calculated using both sets of financial statements – was fully within the agency's discretion, supported by substantial evidence on the record and otherwise in accordance with law.

Go-Pak argues that Commerce should have used the AUV for the single HTS subheading that Go-Pak placed on the record as the surrogate value for paperboard and should not have averaged the AUV for that HTS subheading with the AUV for another HTS subheading that had been advocated by APPC. Go-Pak Br. at 16-24. However, because Commerce reasonably concluded that HTS subheading 4810.92.90 better reflected the type of paperboard used to make paper plates, while HTS subheading 4810.32.90 best reflected the basis weight of paperboard needed to make paper plates that are fit for purpose, Commerce's decision to average the AUVs for the two sources together in determining an appropriate surrogate value was also well within its discretion and supported by substantial evidence on the record.

B.       **Commerce's Determination to Average the Financial Ratios Derived from Alkindo's and Suparma's Financial Statements Was in Accordance with Law**

In the *Final Determination*, Commerce determined to use a simple average of the surrogate financial ratios calculated using information from Suparma's and Alkindo's financial statements.  IDM at 13-16.  Go-Pak challenges that determination, arguing that Commerce was lawfully obligated to use only Alkindo's financial statements in its calculations.  Go-Pak Br. at 8-16.  However, Commerce determined that the evidence on the record established that both companies were Indonesian producers of merchandise comparable to the subject merchandise during the POI.  IDM at 13-16.  Accordingly, Commerce's decision to use both financial statements in its calculations was consistent with its practice, supported by substantial evidence on the record, and otherwise in accordance with law, and should be affirmed by this Court.

When considering financial statements on the record for purposes of calculating a surrogate financial ratio, it is Commerce's practice to determine if each set of statements is sourced from a profitable producer of comparable merchandise in the surrogate country during the period of investigation or review.  *See Ad Hoc Shrimp*, 618 F. 3d at 1,320.  If Commerce determines that two or more sets of financial statements are contemporaneous with the POI and derived from profitable producers of identical or comparable merchandise in the surrogate country, then Commerce's standard practice, as affirmed by the Federal Circuit and CIT, is to use an average of the applicable financial statements to determine the necessary surrogate financial ratios.  *See id.*; *Dorbest Ltd. v. United States*, 604 F.3d 1,363, 1,368 (Fed. Cir. 2010); *NTSF Seafoods Joint Stock Company v. United States*, 487 F. Supp. 3d 1,310, 1,318 (Ct. Int'l Trade 2020).

In this investigation, first in the *Preliminary Determination* and then again in the *Final Determination*, Commerce determined that both sets of financial statements met those criteria,

and therefore using an average of the surrogate financial ratios derived from the two financial statements was warranted.  PDM at 23-24; IDM at 13-16.

With respect to Suparma's 2023 financial statements, Commerce determined that Suparma was "a producer of laminated paper for holding, placing and wrapping food as does a paper bowl or paper plate."  *Id.* at 16 (citing *APPC's SV Sub.* at Exhibit 5, P.R. 123; *Go-Pak SV Rebuttal* at Exhibit 2-A, P.R. 146-148).

With respect to Alkindo, Commerce had determined in the *Preliminary Determination* that Alkindo was a producer of comparable merchandise; that determination remained unchanged in the *Final Determination*.  PDM at 23-24; IDM at 13-16.  Accordingly, Commerce averaged both sets of financial statements in determining a surrogate value for the financial ratios in this investigation.

Go-Pak now argues that Commerce unlawfully used Suparma's financial statements as a source of the surrogate financial ratios.  Go-Pak claims that because Suparma was not at the same level of integration as Go-Pak, Commerce should have used just Alkindo's financial statements.  Go-Pak Br. at 10.  Go-Pak argues that "surrogate ratios of overhead, SG&A, and profit are expressed relative to the company's" expenses in producing subject merchandise, and therefore if a surrogate company's level of integration differs from a respondent's production experience, that can create problems in selecting a surrogate value.  *Id.* at 12.

No one disagrees that surrogate financial statements should appropriately reflect the respondent's experience of producing subject merchandise.  In this case, however, the record of the investigation reflects that it was actually the financial statements of Alkindo, and not Suparma, that came up short.

Suparma's financial statements reflected that 99.6 percent of its revenue in 2023 was derived from the production and sale of paper products. *APPC's SV Sub*. at Ex. 5, P.R. 123. In contrast, Alkindo's financial statements established that 21.54 percent of its revenue in 2023 was derived from two chemical companies, PT Swisstex Naratama Indonesia, which produced chemical materials for yarn and textiles, and PT Alfa Polimer Indonesia, which produced and marketed chemicals for paper, wood, paint, yarn and textiles. Go-Pak Vietnam Surrogate Value Comments at Ex. SV-10, P.R. 126.

In addition, Alkindo's financial statements reflected additional revenue derived from a third company, PT Logistik Naratama, which was engaged in logistics services. *Id.* Go-Pak's expressed concerns that Suparma's level of integration might not sufficiently reflect Go-Pak's overhead and selling, general and administrative ("SG&A") expenses experience in producing subject merchandise pale in comparison to the overhead and SG&A experience of a company that potentially earned "25 percent of its revenue from non-paper industries." IDM at 16.

Accordingly, to the extent that Go-Pak argues that Alkindo's financial statements were somehow superior to those of Suparma's financial statements based on the overhead expenditures devoted to, and profit derived from, the production of comparable merchandise, the record reflects that neither source was a perfect representation of the production of paper plates.

However, Commerce's goal in selecting surrogate financial ratios is not perfection, but representativeness. Both this Court and the Federal Circuit have recognized that Commerce is not required to "duplicate the exact production experience of the (foreign) manufacturers at the expense of choosing a surrogate value and that "a surrogate value must be as representative of the situation in the NME country as is feasible." *National Ford*, 166 F.3d at 1,377 (quoting

*National Ford Chem. Co. v. United States*, 985 F. Supp. 133, 137 (Ct. Int'l Trade 1997)); *see also Ashley Furniture*, 750 F. Supp 3d at 1,350.

Therefore, even if there are differences in the levels of integration between Suparma and Go-Pak in a surrogate value, or Commerce finds that 25 percent of expenditures and revenue in surrogate financial statements pertain to the production or provision of non-subject products and services, Commerce is given "wide discretion" when valuing factors of production. *Ad Hoc Shrimp Trade Action Committee v. United States*, 618 F.3d at 1,316 (citing *National Ford*, 166 F.3d at 1,377).

Go-Pak also challenges Commerce's finding that Suparma was a producer of comparable merchandise, claiming that "Suparma is engaged in paper manufacturing, not package manufacturing." Go-Pak Br. at 13. Go-Pak argues that Suparma "operates in a different industry compared to Go-Pak Vietnam," citing to various sources that distinguish between packaging industries versus paper manufacturing industries. *Id.* at 13-15.

In response to this argument, Commerce concluded in the *Final Determination* that because "information on the record of this investigation indicates that Suparma's production facility also processes paper inputs into paper products," Suparma was "capable of processing paper inputs into laminated paper products used for holding, placing and wrapping cooked, moist food," and therefore the "categorization" of the packaging and paper making into two different industries was a "difference without distinction for purposes of selecting financial statements of Indonesian producers of merchandise comparable to paper plates." IDM at 16. Accordingly, Commerce determined that "the production experiences between Go-Pak Vietnam and Suparma (were) not so different to disqualify Suparma's financial statements from being used to calculate surrogate financial ratios in this investigation." *Id.*

22

Nothing Go-Pak argues in its brief undermines the reasonableness of Commerce's determination in this regard, and the unreasonably "narrow" limitation that Go-Pak argues should apply to Commerce in determining a producer of "comparable merchandise" could easily lead to absurd results.  Go-Pak Br. at 15.  In this case, both companies produced paper products using comparable inputs and processes, and while neither is a perfect match to Go-Pak's production and financial experience, both produce merchandise that can reasonably be considered "comparable" for purposes of selecting surrogate financial ratios.  Again, Commerce's goal in selecting surrogate financial ratios is one of "representativeness" and not the granular analysis argued by Go-Pak.  Indeed, had such a granular analysis been required of Commerce during the investigation, it is likely that Alkindo's financial statements would have failed under such scrutiny because, as explained above, 25 percent of Alkindo's SG&A and overhead expenses had nothing to do with the production of "comparable merchandise."  *See* IDM at 16.

Instead, "to the extent practicable," the surrogate value analysis Commerce should apply in choosing the "best available information" on the record, as affirmed by the Federal Circuit, is to consider "surrogate values that are publicly available, product-specific, reflect a broad market average," are "contemporaneous," and "as representative of the situation in the (nonmarket economy) country as is feasible."  *Changzhou Trina*, 975 F.3d at 1,331; *National Ford*, 166 F.3d at 1,377.  That is the exact analysis which Commerce conducted in selecting surrogate financial ratios in the *Final Determination*.  IDM at 13-16.  Accordingly, the Court should affirm Commerce's determination to use both Alkindo's financial statements and Suparma's financial statements in calculating the surrogate financial ratios as supported by substantial evidence on the record and otherwise in accordance with law.

**C.      Commerce's Determination to Value the Paperboard Input into Paper Plates Using Both HTS Subheadings 4810.32.90 and HTS Subheading 4810.92.90 Was in Accordance with Law**

Go-Pak also challenges Commerce's use of an average of the AUVs for two HTS subheadings to value paperboard inputs – HTS subheading 4810.92.90, which covers multi-ply paper and paperboard, with no basis weight limitation, and HTS subheading 4810.32.90, which covers paper and paperboard, with "more than 95% by weight of the total fiber content" consisting of "wood fibers obtained by a chemical process," but with a clear basis weight of "more than 150 g/m$^2$." Go-Pak argues extensively that the paperboard it uses to produce its paper plates is of the general type of paperboard covered by HTS subheading 4810.92.90, although neither Commerce nor APPC disagreed with that claim on the record. Go-Pak Br. 18-24. Indeed, Commerce stated very clearly in the *Final Determination* that "4810.92.90 clearly covers the paper input used in the production of paper plates." IDM at 9. It is for that reason that Commerce determined to use that HTS subheading as one of the two to determine the surrogate value for paperboard. *Id.*

The problem with HTS subheading 4810.92.90, as Commerce noted in the *Final Determination*, was that "it is silent" with regard to "paper base (sic) weight." *Id.* at 9. Early in the paper plate investigations, Commerce invited comments on the product characteristics most important for AD comparisons, and in the end it concluded, after the number of plates in a package and the surface area of the plates, that paper thickness (labeled "nominal caliper") was third in the hierarchy of comparisons, basis weight was fourth, type of paper fiber was fifth, and paper type was the sixth most important feature in the hierarchy for purposes of AD comparisons. *Product Characteristics Memorandum* at 1-3, P.R. 88.

24

It is no secret why Commerce determined that the thickness and basis weight of the paperboard used to produce paper plates were considered the most important physical characteristics. As APPC expressed directly in its case brief, "regardless of whatever *type* of paperboard subject merchandise is produced from, if it is not of a sufficiently heavy *basis weight*, it will not be sufficiently sturdy and rigid for its intended purposes, holding and conveying food items." APPC Case. Br. at 9, P.R. 217; C.R. 182.

Accordingly, in the *Final Determination*, Commerce explained that "basis weight is a critical component in the manufacture and sale of paper plates as supported by the fact that" Commerce ranked basis weight fourth out of 13 product characteristics that comprise CONNUMs "in the investigation, superseded in the hierarchy of product characteristics only by paper package count," "plate dimensions (plate surface area) and nominal caliper (thickness)." IDM at 10. Paper type, meanwhile, ranked sixth out of 13. Commerce explained that basis weight, unlike paper type, was "in the top third of the considerations for describing the paper plates costs and sales to the United States." *Id.*

With respect to Go-Pak, [    ] percent of its U.S. sales were identified as having a basis weight of [                  ], and at verification Commerce confirmed that the basis weights of Go-Pak's Vietnam paperboard inputs were [                    ]. APPC Br. at 8-9 (citing *Go-Pak Vietnam's Revised FOP and U.S. Sales Databases*, at Exhibit 2, P.R. 210; C.R. 179; *FOP Verification Report*, at 7, P.R. 209; C.R. 177). Therefore, Commerce determined it was important to "take paper base (*sic*) weight into consideration in the valuation of Go-Pak Vietnam's paper inputs," and to consider a surrogate value for paperboard inputs that was "[          ] 150 grams/m²", such as that ¨specified in the description of HS subheading 4810.32.90." IDM at 10; Memorandum from Bryan Hansen, Senior International Trade

PUBLIC VERSION

Compliance Analyst, AD/CVD Operations, Office 1, through Yang Jin Chun, Program Manager, AD/CVD Operations, Office I, to File, *Investigation of Sales at Less Than Fair Value of Certain Paper Plates from the Socialist Republic of Vietnam:  Final Surrogate Value Memorandum* (Jan. 21, 2025) at 2, P.R. 229; C.R. 184 ("*FSV Memo*").  Commerce did not disagree with Go-Pak that HTS subheading 4810.32.90 had physical characteristics that differed from the paperboard inputs used by Go-Pak, but it determined that by using that HTS subheading in its calculations it would "capture" the "critical characteristic of base (sic) weight not covered by" HTS subheading 4810.92.90.  IDM at 10.

Commerce's use of an average of the AUVs for a HTS subheading that reflected the basis weight of Go-Pak's paperboard inputs and the HTS subheading that best reflected the general type of paperboard it used in its production process was reasonable and supported by substantial evidence on the record.

Go-Pak argues that because HTS subheading 4810.92.90 has "no weight limitation," that fact "confirms that the provision is broad enough to cover all relevant base weights, including Go-Pak Vietnam's input."  Go-Pak Br. 21.  That argument ignores the very reason Commerce determined to use HTS subheading 4810.32.90 in its calculations in the first place.

HTS subheading 4810.92.90 is a basket category that covers all paper and all paperboard that meets its physical descriptions – regardless of the basis weight of the paper.  For example, it would cover imports of very thin and weak paper that could not be used in the manufacture of paper plates.  The ultimate goal for Commerce in determining an appropriate surrogate value in this case was to determine a surrogate that best reflected the inputs Go-Pak used in the production of paper plates.  Commerce reasonably determined that an average of these two

values – one best representing the type of product and one representing the basis weight of the product – was the most reasonable means of determining that value.

Go-Pak further alleges that "a narrower range of basis weight coverage is irrelevant" and that HTS subheading 4810.32.90 was "not specific" to Go-Pak's experience.  Go-Pak Br. at 22.  Both of these claims are incorrect.  First, as explained above, Commerce determined for its purposes in conducting an AD analysis that the basis weight of the paperboard used to produce paper plates was very important.  In fact, Commerce determined that it was so important that in all of the AD paper plates investigations Commerce concluded that basis weight would take priority over all other physical characteristics, with the lone exception of caliper, such as fiber content or type of paper.  *See Product Characteristics Memorandum* at 1-3.

Second, Commerce explained that it used HTS subheading 4810.32.90 because of Go-Pak's *own verified production experience*.  *FSV Memo* at 2, P.R. 229; C.R. 184.  In other words, had Go-Pak used paperboard with basis weights that were both lighter and heavier than 150 grams/m$^2$ in manufacturing its paper plates, Commerce may not have determined it necessary to use HTS subheading 4810.32.90 in selecting a surrogate value for paperboard.  It was because Go-Pak only used paperboard with basis weights [          ] 150 grams/m$^2$ in producing subject merchandise that Commerce determined it appropriate to incorporate HTS subheading 4810.32.90 into its surrogate value calculation.  Accordingly, Go-Pak is incorrect when it claims that Commerce's use of that HTS subheading was "not specific to Go-Pak Vietnam's paper."  Go-Pak Br. at 22.

Finally, Go-Pak argues that because Commerce has historically averaged HTS-based AUVs "when the reported factor of production falls within multiple HTS classifications," the Court should determine that Commerce's surrogate value analysis was somehow faulty.  Go-Pak

Br. at 22-24.  Go-Pak claims that in veering from that "practice," Commerce's "explanation" for averaging the AUVs for the two HTS subheadings was neither "adequate" nor "reasoned."  *Id.* at 24, 22 (citing to *Asociacion Colombiana de Exportadores de Flores v. United States*, 6 F. Supp. 2d 865 (1998)).  There is no merit to such a claim.

First, as explained above, Commerce clearly set forth the reasons it was using both HTS subheading 4810.32.90 and HTS subheading 4810.92.90 in its calculations in the *Final Determination*.  IDM at 7-10; *FSV Memo* at 2, P.R. 229; C.R. 184.  It is difficult to imagine what more of an "explanation" Go-Pak would have required of Commerce.

Further, regardless of Commerce's use of averaging and HTS subheadings in the past, the facts of each administrative record stand on their own.  As the Federal Circuit held in *National Ford* and *Risen*, the statute "accords Commerce wide discretion in the valuation of factors of production" because it "does not define what constitutes the 'best available information.'" *National Ford*, 166 F. 3d at 1,377; *Risen*, 122 F.4th at 1,353.  In this case, the values used by Commerce were publicly available, product-specific, reflected a broad market average, and were contemporaneous with the POI.  Accordingly, Commerce used surrogate values consistent with its policies and practice, as recognized by the Federal Circuit.  *See Changzhou Trina*, 975 F.3d at 1,331.

Commerce's determination to use an average of the AUVs for HTS subheadings 4810.92.90 and 4810.32.90 "corresponded to the particular input" at issue; the paperboard type and basis weights used by Go-Pak to produce paper plates.  *See Risen*, 122 F. 4th at 1,354. Accordingly, the Court should determine that Commerce's calculation of the paperboard surrogate values was supported by substantial evidence on the record and was otherwise in accordance with law.

PUBLIC VERSION

## CONCLUSION

For the foregoing reasons, Defendant-Intervenor respectfully requests that this Court deny Go-Pak's motion for judgment on the agency record and sustain Commerce's *Final Determination* as supported by substantial evidence and otherwise in accordance with law.

Respectfully submitted,

Date: January 20, 2026                    */s/ Adam H. Gordon*
                                          Adam H. Gordon, Esq.
                                          Benjamin J. Bay, Esq.
                                          Scott D. McBride, Esq.

                                          THE BRISTOL GROUP PLLC
                                          1707 L Street NW
                                          Suite 1050
                                          Washington, DC 20036
                                          Tel:  (202) 991-2701

                                          *Counsel to the American Paper Plate Coalition*

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATION

I hereby certify that according to the word count function of Microsoft Word, which was used to prepare the brief, the foregoing brief contains 8,175 words and therefore complies with word count limitation in the Standard Chambers Procedures.

*/s/ Adam H. Gordon*
Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.

**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel:  (202) 991-2701

*Counsel to the American Paper Plate Coalition*